UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ANTONIO V., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19 CV 3172 JMB |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On March 14, 2017, plaintiff Antonio V. protectively filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., with an alleged onset date of March 10, 2017. (Tr. 140-41, 61).  After plaintiff's application was denied on initial consideration (Tr. 75-79), he requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 82-83).

Plaintiff and counsel appeared for a hearing on December 18, 2018.  (Tr. 25-60).  Plaintiff testified concerning his disability, daily activities, functional limitations, and past work.  The ALJ also received testimony from vocational expert Anne H. Darnell, M.Ed.  The ALJ issued a decision denying plaintiff's applications on March 27, 2019.  (Tr. 10-20).  The Appeals Council denied plaintiff's request for review on November 1, 2019.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability and Function Reports and Hearing Testimony

Plaintiff, who was born in January 1959, was 58 years old on his alleged onset date.  (Tr. 163).  He left school after tenth grade and was in prison between 1986 and 1999.  (Tr. 46).  Upon his release, he received training in heating and cooling and went to work as a maintenance man for his brothers, who owned several rental properties.[1]  (Tr. 46, 164).  Although he stopped working in 2017 due to his health concerns, he remained on the payroll until the properties were sold in November 2017.  (Tr. 48, 154, 34).  He lived with his significant other and received financial support from his family.  (Tr. 197).  He was financially responsible for his son and his son's mother.

Plaintiff claimed he was disabled due to back injury, constant pain, acute bronchitis, constant pneumonia, sleep disorder, breathing problems, depression, anxiety, constant fluctuation in weight, constant congestion and phlegm, and unspecified emotional problems.  (Tr. 62).  The medication list submitted with his application in April 2017 included three antibiotics, two nasal sprays, clonazepam to treat anxiety, diazepam to treat stress and pain, three narcotic pain medications, a steroid for asthma, and a prescription cough medicine.  (Tr. 166).  Some of his medications caused drowsiness, loss of appetite, constipation, and a runny nose.

Plaintiff's May 2017 Function Report was completed with the assistance of his significant other.  (Tr. 196-203).  Plaintiff stated that he was unable to work because he experienced back pain after standing, bending, lifting, or moving for a limited time.  He then had to sit or take pain medication and was unable to complete work duties.  He used to be able to lift more than 300 pounds, run up to 22 miles, and work long hours.  At the time he applied, he experienced pain if

---

[1] Plaintiff testified that he also did maintenance work "on the side."  (Tr. 34).

he lifted more than 15 to 20 pounds and he was unable to walk more than a block before he needed to rest for 15 to 20 minutes.  Pain interfered with sleep, bathing, and dressing.   He was able to prepare sandwiches and frozen meals, complete light laundry, and use a riding lawn mower for about 20 to 30 minutes.  He lost his driver's license after he had four motor vehicle accidents in the course of a year due to lack of alertness.  He did limited grocery shopping.  He was able to manage financial accounts only when he was not fatigued or taking pain medications.   He described his daily activities as watching television and sitting on the front porch.  He occasionally played chess, but stated that he got more confused than he used to.  He socialized with others, mostly on the telephone.  He went to family gatherings and medical appointments.  He needed reminders to take his medications and attend appointments.  He was not as sociable as he used to be and was somewhat more withdrawn.  Plaintiff had difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, climbing stairs, seeing, memory, completing tasks, concentrating, understanding, following instructions, using his hands, and getting along with others.  He could not pay attention for more than five minutes and no longer followed spoken or written instructions very well.  He avoided authority figures as much as possible, but was not confrontational with them.  He no longer handled stress or changes in routine well, noting that changes confused him.  His present circumstances had brought back fear and memories of things he went through in school, childhood, and prison.  In a narrative section, plaintiff wrote that he had been depressed for a long time, could not concentrate, and his hands shook.  When he did sleep, he had constant nightmares.  He experienced a lot of trauma as a child and described himself as a troubled teen.  He had been in group homes as a teen and in prison for 14 years as an adult.  He felt more anger recently, and thought a lot about his 16-year-old son who was killed.  He used to be the life of the party, but now was withdrawn.  He needed constant

reminders.  He was always constipated and his weight went up and down.  His appetite was poor and he hardly had the energy to eat.  He was unable to breathe through his nose and stopped breathing while he slept.  He constantly coughed up phlegm.

In a letter dated May 14, 2018, plaintiff's brother (and employer) stated that plaintiff used to perform roof repairs and general maintenance.  (Tr. 323).  Due to injuries and illness, he could not do heavy work and he suffered from heat exhaustion.  He slept poorly and often came to work "very drowsy and incoherent."  He was in a "constant state of pain."  In January 2017, plaintiff was ordered not to return to work but to seek medical attention.  He remained on the payroll until May 2018 when the realty companies ceased operations.

Plaintiff's testimony at his December 18, 2018, hearing was extremely disjointed and lacked details about his conditions and medical treatment.  He did state that his health had steadily declined and that he had been hospitalized four or five times in two years because his lungs kept "filling up."  (Tr. 39, 43).  He brought to the hearing medical bills for a hospital admission in September 2017, but no records for this admission were provided.[2]  (Tr. 40-41).  He also testified that he was hospitalized on December 2, 2018, with a high fever and breathing difficulties, and his family was told "to expect the worst and hope for the best."  (Tr. 30).  When he was discharged, he was provided with an  oxygen tank,[3] and a nebulizer, the latter of which he brought with him to the hearing.  (Tr. 37).   There is no documentation of this hospitalization in the record.  He was scheduled to see pulmonologist Marcee Stegemeier on January 7, 2019, for laboratory tests and imaging scans.  The ALJ held the record open to receive the medical reports for this appointment,

---

[2] Although no hospital records were provided, plaintiff's primary care physician G.S. Grewal, M.D., noted that plaintiff was admitted to the hospital for pneumonia in September 2017.  (Tr. 793).

[3] The ALJ asked plaintiff whether he had a prescription for the oxygen.  He responded, "No.  I just use it. . . But she[Dr. Stegemeier]  told me she would issue me one if I wanted one after I go back and take all these tests."  (Tr. 44).

but none were provided.  (Tr. 31, 10).  Plaintiff stated that he intended to go to the emergency room following his hearing because he was worried about blood in his stool.

Plaintiff was using a cane and back brace at the hearing.  (Tr. 35).  He stated that he had low back pain that was aggravated by lifting even light weight.  (Tr. 35-36).  He testified that he had back surgery seven to ten years before the hearing.  (Tr. 45).  He had been taking nine pain medications but had reduced it to Oxycodone.  (Tr. 57).  He was most comfortable in a recliner with his feet elevated.  (Tr. 37).  Plaintiff also testified that he had a severe sleep disorder of several years' duration.  He frequently stayed up three and four days at a time.  He typically slept only two or three hours a night, unless he took Valium or Nyquil, in which case he generally slept six or seven hours.  (Tr. 37-38).  The doctors did not want him to take Nyquil to sleep.

Vocational expert Anne Darnell testified that plaintiff's work as maintenance worker was classified as skilled, very heavy work as performed.[4]  (Tr. 52).  The ALJ asked Ms. Darnell about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience, who was able to perform work at the medium exertional level; who could occasionally climb ramps and stairs; and could frequently perform all other postural activities.  The individual could occasionally work at unprotected heights and around moving mechanical parts and have occasional exposure to pulmonary irritants.  Ms. Darnell stated that such an individual could not perform plaintiff's past work.  (Tr. 53-54).  There were, however, other jobs available in the national economy, including laborer, stores; hand packager; and recycling manager.  (Tr. 54).   In response to questions from plaintiff's counsel, Ms. Darnell stated that off-task behavior exceeding 10 percent of the workday and more than one absence per month would preclude employment.  (Tr. 55).  Ms. Darnell stated that her testimony was consistent with the Dictionary of Occupational

---

[4] Plaintiff testified that he lifted stoves, refrigerators and air conditioning units that weighed 300 pounds, usually without help.  (Tr. 52-53).

Titles (DOT), with the exception of information regarding time off-task and absences, which the DOT did not address.  Her testimony on these two limitations was based on her "30 years of professional experience dealing with employers."  (Tr. 56).

### C.    Medical and Opinion Evidence

During the period under review, plaintiff received treatment for low back pain and respiratory illnesses, and was evaluated for poor sleep, in addition to seeing his general practitioner.

Plaintiff's history of back pain dates back to at least March 2010, when an MRI of the lumbar spine disclosed developmental spinal stenosis with disc degeneration and disc herniation. (Tr. 558).  A second MRI in August 2010 revealed that the disc herniation had increased in size and affected a nerve root, in addition to mild facet joint degeneration at multiple levels.  (Tr. 557). Between March 2010 and June 2011, plaintiff was treated fourteen times by the Center for Interventional Pain Management for a variety of musculoskeletal conditions, including lumbar disc displacement, degenerative disc disease, lumbago, lumbar radiculopathy, lumbosacral spondylosis, sacroiliitis, sciatica.  (Tr. 549-50, 547-48, 543, 542, 541, 582, 576, 578-79, 559-61, 562-63, 564-65, 566-67, 568-70).  During this time, plaintiff was treated with nerve root injections, radiofrequency neurolysis, joint injections, and narcotics, including Narco, Dilaudid, and hydromorphone.

Plaintiff was evaluated by neurosurgeon Andrew Youkilis, M.D., in September 2010.  (Tr. 344-47).  Plaintiff explained that he developed low back pain and spasms in his hands in feet in January 2010.  The injections helped initially but his pain was slowly worsening and he started taking narcotics in March 2010.  Dr. Youkilis assessed plaintiff with neurogenic claudication, related to left-sided L4-L5 disc herniation which caused acquired lumbar stenosis.  On September

6

21, 2010, plaintiff underwent a left-sided L4-L5 microdiscectomy.  (Tr. 340-50).  At follow up one month later, plaintiff reported that his leg pain, weakness, and numbness had resolved and he was eager to return to work. (Tr. 343).  Dr. Youkilis stated that plaintiff could return to full duty in early December 2010.   As noted above, however, plaintiff continued to receive pain management services for several months following his surgery.  An MRI of the lumbar spine in June 2011 disclosed diffuse degenerative disc disease with space narrowing and desiccation at nearly all levels. (Tr. 552).  There were mild endplate changes.  The canal was developmentally small throughout, which caused a mild degree of central spinal stenosis at L2-L3, L3-L4, and L4-L5.  There was also a focal left-sided disc herniation at L4-L5 that likely affected a nerve root.  In November 2011, plaintiff returned to Dr. Youkilis for evaluation of low-back pressure.  (Tr. 351).  He denied experiencing pain in his lower extremities and was able to run up to seven miles.  He complained of poor equilibrium and poor sleep.   Office notes from plaintiff's primary care physician indicate that plaintiff sought further treatment from Dr. Youkilis in late 2017 and early 2018, although no records from these visits have been provided. (Tr. 776-78).

The record shows that plaintiff frequently sought emergency treatment for respiratory infections.  The first instances in this record occurred on December 22 and December 29, 2010, when plaintiff complained of cough, congestion, choking, and nausea. (Tr.  367-73, 374-80).  X-rays disclosed no lung disease.  He was diagnosed with sinusitis and given an antibiotic and naproxen.  He returned on March 16, 2011, with complaints of feeling dizzy and weak after taking cold medicine. (Tr. 381-90).  He was still coughing.  An examination and x-rays were normal and plaintiff's sister reported that she thought he was overmedicating with pain medication and valium because his speech was slurred.  The clinical impression was cough, adverse drug reaction, narcotic

dependence, and overdose of Valium.  He was prescribed Restoril for sleep, an albuterol inhaler, and naproxen.

On April 29, 2011, plaintiff was seen by Robert Holloway, M.D., to establish care.[5]  (Tr. 571-72).  Plaintiff reported intermittent anxiety and stress with irritation, but normal energy, interest, and concentration.  He complained of back pain, decreased strength and endurance, and somnolence after meals.  On examination, plaintiff displayed normal reflexes, normal sensation, and full motor strength, and smelled of liquor.  He was diagnosed with insomnia, post laminectomy syndrome of the lumbar region, malaise, and fatigue.  He was prescribed 800 mg of ibuprofen to be taken three times a day, 10 mg of Valium as needed, the narcotic Dilaudid, the benzodiazepine clonazepam, and melatonin.

On January 26, 2012, plaintiff was taken by ambulance to the emergency department with an oxygen saturation level in the upper 60s.  (Tr. 463-70).  He had developed a cough five days earlier and, at one point, had a fever of 104 degrees.  He was diagnosed with pneumonia and admitted to the medical floor.  On examination, he had a fever and mild respiratory distress, with an oxygen saturation level of 92%.  He had swollen lymph nodes, crackle sounds in the right lung with occasional wheezes, and was tachycardic.  It was noted that reactive airway disease should be considered as a cause for his multiple episodes of bronchitis.  An x-ray on January 28, 2012, showed that his lungs were clear with better inspiration.  He also had aortic atherosclerosis.  He was discharged the following day with an antibiotic, diazepam, Dilaudid, and prednisone.

There are no records of further medical treatment until July 2014 when plaintiff was treated for a wasp sting.  (Tr. 477-85).  A physical examination was unremarkable.  (Tr. 483).  In September 2014, he went to the emergency department at SSM St. Mary's the day after a motor

---

[5] There are records of only one further visit with Dr. Holloway's office, in September 2011, when plaintiff was seen by a nurse practitioner for medication refills.  (Tr. 573-74).

vehicle accident.  (Tr. 392-99).  On examination, plaintiff had tenderness of the lumbar back with spasm and full range of motion.  An x-ray of the lumbar spine showed diffuse degenerative changes without evidence of fracture or subluxation.  He was provided with naproxen, Flexeril, tramadol, Restoril, and albuterol.  He returned to the emergency department in January 2015, following another motor vehicle accident.  (Tr. 400-06).  He complained of pain in his back and worsening pain in his neck.  On examination, his neck was supple with normal range of motion and muscular tenderness.  An x-ray of the cervical spine showed diffuse moderate cervical degenerative disc disease and straightening of the cervical lordosis.  The diagnostic impression was cervical strain and degenerative arthritis.  He was discharged with tramadol, naproxen, Restoril, Flexeril, and an inhaler.  Plaintiff had 13 chiropractic appointments between January 23 and February 19, 2015. (Tr. 412).

The next significant event occurred on August 23, 2015, when plaintiff sought emergency treatment for bloody sputum and vomiting.  (Tr. 432-51).  A chest x-ray showed a large air space opacification in the right lung, indicative of multilobar pneumonia, while a CT scan showed ground glass-opacity throughout the right lung and minimally in the left.  He was discharged with an antibiotic.

On October 16, 2015, plaintiff sought emergency treatment for back and shoulder pain. (Tr. 426-31, 452-56).  He reported that he tripped and fell on his left shoulder about six months earlier and that he had just started physical therapy.  He awoke in the morning with unbearable pain, which he rated at level 10 on a 10-point scale.  Dilaudid reduced the pain to 0 out of 10.  An examination showed normal ranges of motion and no tenderness to palpation. X-rays showed straightening of the lumbar spine with spurring at multiple levels, especially L2, with moderate disc narrowing, and minimal degenerative changes to the left acromioclavicular joint.  Plaintiff

9

returned to the emergency department on November 2, 2015, with reports that he was spitting up blood.   An x-ray showed peribronchial cuffing in the major bronchi bilaterally and he was diagnosed with cough with hemoptysis.[6]   (Tr. 422-25).

Plaintiff saw primary care physician G.S. Grewal, M.D.,[7] on August 3, 2016.  (Tr. 539). The notes list anxiety, low back pain, degenerative disc disease, GERD, insomnia, COPD, bronchitis, muscle spasms, and chronic pain syndrome.  Plaintiff's medications included Valium, Dilaudid, oxycontin, ibuprofen, and gabapentin.   Plaintiff's weight was 171 pounds, a decrease from 185 pounds in February 2016.  When plaintiff next saw Dr. Grewal in January 2017, his weight had risen to 178 pounds and his problem list remained unchanged.  Plaintiff had monthly appointments with Dr. Grewal between May 2017 and September 2018.  (Tr. 769-802).  During that time, plaintiff's weight fluctuated between 174 and 200 pounds.  (Tr. 791, 781).  Dr. Grewal added vitamin D deficiency to plaintiff's diagnoses in August 2017, and hypertension and chronic kidney disease in September 2018.  (Tr. 796, 770).  In addition to the medications listed above, Dr. Grewal also prescribed Albuterol, Percocet, Levaquin, oxycodone, vitamin D3, nasal sprays, and ointments for skin conditions.  Starting in May 2018, Dr. Grewal described plaintiff's vitamin D deficiency, bronchitis, GERD, back pain, and insomnia as controlled by medication.  (Tr. 775).

On December 21, 2016, plaintiff again presented at an emergency department with coughing and weakness.  (Tr. 496-506).  X-rays disclosed infiltrate in the right upper lung and he

---

[6] Peribronchial cuffing is a radiographic term used to describe haziness or increased density around the walls of a bronchus or large bronchiole.  It may represent bronchial wall thickening or fluid around bronchi due to lymphatic congestion.   It can be seen in a number of pathologies, including pulmonary edema, small airways inflammatory disease, bronchiolitis, and asthma.  See radiopaedia.org-peribronchial-cuffing (last visited Oct. 21, 2020).   Hemoptysis is the expectoration of blood from the lower airways.  hemoptysis definition (last visited on Oct. 26, 2020).

[7] Plaintiff began treatment with Dr. Grewal in 2011.  (Tr. 167).  Dr. Grewal's handwritten treatment notes consist largely of a problem list and medications.  Notations regarding examination findings are generally cryptic or illegible.

was diagnosed with pneumonia and possible hypertension.  On December 23, 2016, he presented at a different emergency department complaining of generalized weakness and shortness of breath. (Tr. 521-31).  His family members reported that he had been weak and confused, with strange behavior and decreased appetite.  On examination, he had slightly decreased breath sounds.  Chest x-rays showed that the infiltrate had improved.  He was prescribed an antibiotic and cough medicine.

Starting in January 2017, plaintiff underwent evaluations of his sleep and lung issues.  On January 13, 2017, Raymond E. Bourey, M.D., noted that plaintiff had a history of falling asleep while driving and while laughing, indicators of possible cataplexy.  (Tr. 655-59).  His past medical history included 2013 findings of bilateral inferior turbinate hypertrophy,[8] vocal cord polyp, and hoarseness.  On examination, Dr. Bourey noted coarse lung sounds, a grade-one heart murmur, pretibial edema, and deviation of the nose.  A laryngoscope on February 21, 2017, confirmed the prior diagnoses of turbinate hypertrophy and polyp.  (Tr. 651-54).  Haley Bray, M.D., prescribed nasal spray, referred plaintiff to speech therapy to address hoarseness, and noted that surgery to reduce the turbinates was an option.[9]  On February 22, 2017, pulmonologist Salik Choudhary, M.D., evaluated plaintiff.  (Tr. 647-50).  Plaintiff reported that for the past nine years he had episodes of wheezing, coughing, and bronchitis two or three times each year, each resolving only

---

[8] The nasal turbinates are long, narrow passageways that help to warm and moisten the air that flows in through the nose.  In turbinate hypertrophy, the turbinates are too large.  This condition can cause breathing problems, frequent infections, and nosebleeds.  See www.healthline.com-turbinate hypertrophy (last visited on Oct. 22, 2020).

[9] On March 17, 2017, speech therapist Michelle Payne, SLP, observed that plaintiff kept falling asleep during the evaluation after taking a sleep aid at 3:00 a.m. (Tr. 643-44).  He reported that he was not bothered by the roughness of his voice, which Ms. Payne rated as severe, and was not interested in surgery to remove the polyp from his vocal cord unless it would improve his sleep.  She concluded that plaintiff was not a good candidate for speech therapy.

with antibiotics.  He had past exposures to asbestos and tuberculosis.  Chest x-rays disclosed no acute pulmonary process.  Possible causes for plaintiff's symptoms were identified as upper airway resistance syndrome (UARS),[10] bronchial asthma, GERD, bronchitis, sinusitis, non-asthmatic eosinophilic bronchitis,[11] neoplasm, and bronchiectasis.[12]  He was directed to keep using an inhaler to treat wheezing and cough and nasal sprays to treat rhinitis.

A diagnostic polysomnogram was completed on March 6, 2017.  (Tr. 645-46, 639-44). Plaintiff had 18 awakenings and 37 arousals, resulting in a sleep efficiency of 48%, with no stage 3 sleep at all.  He had 6.2 respiratory effort-related arousals (RERA)[13] per hour.  He was noted to be snoring.  The degree of sleep fragmentation he experienced put him at risk for several metabolic

---

[10] Upper airway resistance syndrome (UARS) "is very similar to obstructive sleep apnea (OSA) in that the soft tissue of the throat relaxes, reduces the size of the airway, and results in disturbed sleep and consequent daytime impairment, including excessive daytime sleepiness.  Although the increase in upper airway resistance is not enough to meet criteria of the sleep disordered breathing that define obstructive sleep apnea, the resulting increase in breathing effort does cause a brief awakening from sleep that is often undetected by the affected individual. When this scenario repeats throughout the night, sleep is impaired, just like in obstructive sleep apnea." Stanford Medicine UARS  (last visited Oct. 29, 2020).  "The most frequent symptoms are excessive daytime sleepiness, fatigue and sleep fragmentation. However, UARS patients also present significantly more often with sleep-onset and sleep-maintenance insomnia, postural hypotension, headaches, gastroesophageal reflux, irritable bowel syndrome, anxiety and alpha-delta sleep." Luciana B.M. de Godoy, et al., Treatment of upper airway resistance syndrome in adults: Where do we stand?, Sleep Sci. 2015 Jan-Mar; 8(1): 42–48. 2015 Review of Literature re Treatment of UARS (last visited on Oct. 29, 2020).

[11] Non-asthmatic eosinophilic bronchitis (NAEB) is a chronic disease and consists of eosinophilic inflammation of the respiratory tract, without any bronchospasm.  See Non-asthmatic eosinophilic bronchitis (last visited Oct. 22, 2020).   Eosinophilia is a higher than normal level of eosinophils, which are a type of disease-fighting white blood cell.  The condition most often indicates a parasitic infection, an allergic reaction, or cancer.  See eosinophilia definition (last visited Oct. 22, 2020).

[12] "Bronchiectasis is a condition where the bronchial tubes of your lungs are permanently damaged, widened, and thickened.  These damaged air passages allow bacteria and mucus to build up and pool in your lungs. This results in frequent infections and blockages of the airways."  See bronchiectasis definition (last visited Oct. 22, 2020).

[13] "An RERA is an event characterized by increasing respiratory effort for 10 seconds or longer leading to an arousal from sleep but one that does not fulfill the criteria for a hypopnea or apnea."  See RERA events (last visited on Oct. 22, 2020).

sequelae, including hypertension, cardiac events, thrombosis, weight gain, insulin resistance, and weight gain.  In addition, the daytime effects on cognition and functioning placed him at risk for accidents.  He was to return for a trial of positive airway pressure machines, reduce his weight from his current 191 pounds,[14] undertake daily exercise,[15] and be counseled on good sleep hygiene. In addition, plaintiff's nasal airway obstruction should be corrected.   By contrast, Joshua Hentzelman, M.D., opined that plaintiff's Apnea-Hyponea Index score of 1 did not warrant surgical intervention.  (Tr. 679).

Plaintiff sought emergency treatment for low back pain on April 5, 2017.   (Tr. 583-99). He had tripped and fallen on his back two days earlier.  He was also taking over-the-counter medication for a cough.  An examination was unremarkable while x-rays showed narrowing of disc spaces and endplate osteophyte at T12 through L4 and atherosclerotic changes of the aorta with tortuosity; there was no acute cardiopulmonary abnormality or acute fracture or subluxation of the thoracic or lumbar spine.  He was diagnosed with muscle strain and given an injection of Toradol.

Pulmonary function tests on April 10, 2017, were normal, with the exception of moderate air trapping.  (Tr. 659-62, 686).  He was prescribed medication for the treatment of GERD and asthma. (Tr. 685).  On April 12, 2017, pulmonologist John K. Mwangi, M.D., noted that plaintiff's oxygen saturation level was 88%.  (Tr. 685-86).  He assessed plaintiff with (1) chronic cough with air trapping with bronchodilator suggestive of asthma, possible GERD, and possible chronic bronchitis with nonproductive cough; (2) history of uncontrolled GERD; and (3) history of vocal cord polyp.  He prescribed omeprazole to treat GERD and Symbicort to treat bronchitis.

---

[14] On May 24, 2017, Dr. Grewal recorded plaintiff's weight as 177.  (Tr. 802).

[15] Plaintiff noted that he could still run 8 miles and always slept better after high levels of activity.  (Tr. 641).

13

In August 2017, plaintiff told Dr. Grewal that he had gone to urgent care for treatment of pneumonia.  (Tr. 796-97).  He was scheduled for a chest x-ray and CT scan.  There are no further records regarding the visit to urgent care, or the x-ray and scan.  Dr. Grewal discontinued plaintiff's prescriptions for Dilaudid and Percocet at that visit.   On September 14, 2017, Dr. Grewal prescribed Levaquin, noting that plaintiff had been hospitalized after spitting up blood.  (Tr. 793).  In October 2017, plaintiff reported that he had again sought emergency care for treatment of pneumonia and requested another prescription for Levaquin, which Dr. Grewal provided.  (Tr. 791-92).  Plaintiff apparently saw the pulmonologist on November 28, 2017, but those records have not been provided.  (Tr. 788).  With respect to plaintiff's complaints of pain, Dr. Grewal noted in November 2017 that plaintiff's neurosurgeon, Dr. Youkilis, did not recommend surgery but wanted plaintiff to continue receiving pain management services.  (Tr. 787).  In February 2018, Dr. Grewal noted that plaintiff was waiting to see Dr. Youkilis, who wanted plaintiff to continue pain medications in the interval.  Plaintiff received a prescription for oxycodone at that visit.  (Tr. 783).  Dr. Grewal's records from May 2018 note that plaintiff had been hospitalized on April 17, 2018, and had been prescribed cough medicine and an antihistamine.  He was also taking an antibiotic and was to see a pulmonologist and get new pulmonary function tests.  (Tr. 776-77).  The hospital's and pulmonologist's  records have not been provided.

On July 10, 2017, Marsha Toll, Psy.D., completed a Psychiatric Review Technique form based on a review of the records.  (Tr. 64-65).  Dr. Toll noted that, although plaintiff claimed to suffer from anxiety and depression, the medical record did not indicate that plaintiff had ongoing psychological symptoms that would support a severe impairment.  Further development of the record was not expected to change the outcome and thus was not deemed necessary.  The ALJ gave great weight to Dr. Toll's opinion, noting that although plaintiff had a historic diagnosis of

14

anxiety, he did not receive regular mental health treatment or see a specialist.  He had been prescribed Valium, but it appears to have been prescribed as a sleep aid and he stopped taking it in May 2018.  (Tr. 13).  Plaintiff does not contest the weight the ALJ gave to Dr. Toll's opinion.

On July 11, 2017, nonexamining physician John Jung, M.D., assessed plaintiff's physical residual functional capacity based on a review of the records then on file.  (Tr. 64, 66-68).  Plaintiff had severe impairments of degenerative disc disease, chronic bronchitis, and sleep-related breathing disorders.  Dr. Jung concluded that plaintiff's breathing issues were non-severe.  He had a long-established history of back pain, but after semi-regular treatment in 2000 for a herniated disc, the record did not show complaints again until April 2017, when plaintiff fell and injured his back.  Dr. Jung noted that the records from April 2017 did not show any acute injury or justify a sudden change in functional capacity.  Dr. Jung opined that plaintiff was able to occasionally lift or carry up to 50 pounds and frequently lift or carry up to 25 pounds; stand or walk, and sit for 6 hours in an 8-hour day; and was able to use hand and foot controls.  He had no environmental limitations.  (Tr. 77).  The ALJ gave weight to Dr. Jung's exertional limitations but found that plaintiff's respiratory issues merited modest environmental limitations.  (Tr. 18).  Plaintiff contends that Dr, Jung's opinion does not warrant any weight because he did not address limitations arising from UARS or plaintiff's prescription pain medications.

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

15

to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number

of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high."   Id.   Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider).  Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d

549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr. 10-20).  The ALJ found that plaintiff meets the insured status requirements through December 31, 2022, and had not engaged in substantial gainful activity since March 10, 2017, the alleged onset date.  (Tr. 12).  At step two, the ALJ found that plaintiff had the severe impairments of lumbar degenerative disc disease and UARS.  (Tr. 13).  The ALJ concluded that plaintiff's insomnia and GERD did not significantly impair plaintiff's ability to perform basic work activities and thus were not severe.  (Tr. 13).  In addition, plaintiff's alleged depression and anxiety were not medically determinable impairments.  Id.  The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment, including listings 1.04 (disorders of the spine) or 3.02 (chronic respiratory disorders).  (Tr. 14).

The ALJ next determined that plaintiff had the RFC to perform medium work,[16] except that he could occasionally climb ladders, ropes, or scaffolds; and could occasionally work at unprotected heights, around moving mechanical parts, in vibration, and in pulmonary irritants.  Id.

---

[16] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567, 416.967.

In assessing plaintiff's RFC, the ALJ summarized the medical record, as well as plaintiff's written reports and testimony regarding his abilities, conditions, and activities of daily living.  (Tr. 14-18).  While the ALJ found that plaintiff's severe impairments could reasonably be expected to produce some of the alleged symptoms, the ALJ also determined that plaintiff's statements regarding the intensity, persistence, and limiting effect of his symptoms were "not entirely consistent with" the medical and other evidence.  (Tr. 18).

At step four, the ALJ concluded that plaintiff was unable to perform his past relevant work.  (Tr. 18-19).  His age on his date last insured placed him in the "advanced age" category.  He had a limited education and was able to communicate in English.  (Tr. 19).  The transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework suggested that plaintiff was not disabled whether or not he had transferable skills.  The ALJ found at step five that someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in substantial numbers in the national economy, including recycling laborer and laborer, stores.  (Tr. 19).  Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from March 10, 2017, the alleged onset date, through April 1, 2019, the date of the decision.  (Tr. 20).

## V. <u>Discussion</u>

Plaintiff contends that that the ALJ incorrectly determined that he has the RFC to perform a limited range of medium work without obtaining the records from the January 2019 appointment with the pulmonologist.  He also argues that the ALJ should have ordered a consultative evaluation.

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical

and mental activities."  SSR 96-8p, 1996 WL 374184 (July 2, 1996).  As the Eighth Circuit recently

stated, "the RFC determination is a 'medical question,' that must be supported by some medical

evidence of [plaintiff's] ability to function in the workplace.'"  Noerper v. Saul, 964 F.3d 738, 744

(8th Cir. 2020) (citations omitted).   "But, the RFC is a decision reserved to the agency such that

it is neither delegated to medical professionals nor determined exclusively based on the contents

of medical records."  Id. (citation and parenthetical omitted).  "[A]lthough medical source opinions

are considered in assessing RFC, the final determination of RFC is left to the Commissioner, . . .

based on all the relevant evidence, including the medical records, observations of treating

physicians and others, and an individual's own description of [his or her] limitations."  Id. at 744-

45 (citations omitted).  "Similarly, the underlying determination as to the severity of impairments

is not based exclusively on medical evidence or subjective complaints.  Rather, regulations set

forth assorted categories of evidence that may help shed light on the intensity, persistence, and

limiting effects of symptoms."  Id. at 745 (footnote and citations omitted).  Similar factors guide

the analysis of whether a claimant's subjective complaints are consistent with the medical

evidence.  Id. (footnote, citation and parenthetical omitted).  Ultimately, the claimant is responsible

for providing evidence relating to his RFC and the Commissioner is responsible for developing

the claimant's "complete medical history, including arranging for a consultative examination(s) if

necessary, and making every reasonable effort to help [the claimant] get medical reports from [the

claimant's] own medical sources."  Turner v. Saul, No. 4:18 CV 1230 ACL, 2019 WL 4260323,

at *8 (E.D. Mo. Sept. 9, 2019) (quoting 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)).

At the December 2018 hearing before the ALJ, plaintiff reported that he had recently been

hospitalized for pneumonia and that he had an appointment in early January 2019 with Dr.

Stegemeier, a pulmonologist.  (Tr. 31, 43).  He testified that he needed x-rays, blood tests, and a

CAT scan to determine why his lungs "keep filling up."  The ALJ stated that she wanted to see the testing and agreed to hold the record open. (Tr.  56). Those records were never provided.  Plaintiff argues that the ALJ erred in determining that he had the RFC to perform medium-exertion work without first reviewing the January 2019 records.  The Court agrees.

The "disability determination process is not an adversarial process."  Noerper, 964 F.3d at 747.  "Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).  That duty extends even to cases where, as here, an attorney represented the claimant at the administrative hearing.  Id.  The ALJ possesses no interest in denying benefits and must act neutrally in developing the record.  Id.  In Noerper, which was decided after the parties submitted their briefs in this matter, the Eighth Circuit considered the ALJ's duty to develop the record.  In that case, the ALJ had concluded that the plaintiff retained the ability to stand or walk for 6 hours in an 8-hour workday, despite complaints of knee pain due to cartilage loss.  On appeal, the majority held that there was no reliable evidence to support that conclusion and remanded for further development regarding the plaintiff's functional limitations on walking and standing.  Noerper, 964 F.3d at 740, 746.  "In reaching this result, we do not suggest that an ALJ must in all instances obtain from medical professionals a functional description that wholly connects the dots between the severity of pain and the precise limits on a claimant's functionality.  Something, however, is needed."  Id.  The sole evidence in support of the 6-hour determination in Noerper was the report of a nonexamining consulting physician.  But, as in this case, the report predated the majority of the treatment records concerning the plaintiff's knee conditions and thus did not constitute substantial evidence for the limitation.  Noting that the ALJ has a duty to develop the record, the court stated that "the absence of evidence translating the

medical evidence and subjective complaints into functional limitations, coupled with the failure to address or resolve differences in [providers'] medical opinions leaves us unable to determine the permissibility of the Commissioner's RFC determination."

Unlike Noerper, this case does not have the additional issue of conflicting medical opinions.[17]  Nonetheless, the Court finds itself similarly hampered with respect to determining whether the ALJ properly concluded that plaintiff retains the ability to perform medium-exertion work, because the ALJ did not address the impact of plaintiff's repeated episodes of pneumonia and/or bronchitis.  The record documents that plaintiff was treated for pneumonia in January 2012, August 2015, and December 2016; presented with coarse lung sounds in January 2018; and had an oxygen saturation level of 88% in April 2017.  In addition, plaintiff's primary care provider noted that plaintiff sought emergency care for possible pneumonia in August, September, and October 2017.  Plaintiff brought to his hearing billing records for a hospital admission in September 2017 and testified to yet another admission in December 2018.  Finally, he had an appointment with a pulmonary specialist in January 2019.  Even if these repeated illnesses did not degrade plaintiff's overall exertional capacity, frequent absences for treatment and recovery would probably preclude sustained employment.  The Court finds that the ALJ should have obtained additional records regarding plaintiff's chronic respiratory illnesses.

Plaintiff claims that he is limited to no more than light exertion by virtue of his spinal conditions.  In assessing these conditions, the ALJ noted that plaintiff underwent a microdiscectomy in 2010 and worked with accommodation until January 2017. (Tr. 15).  In April 2017, plaintiff reported that he could still run eight miles. (Tr. 17).  As the ALJ noted, there were no subsequent treatment notes detailing a greater degree of pain and limitation, and his physician

---

[17] Indeed, there is only one medical opinion with respect to plaintiff's exertional limitations — that of nonexamining consultant, Dr. Jung, whose opinion was rendered in April 2017.

discontinued plaintiff's pain meds in August 2017.  In November 2017, plaintiff's primary care physician directed him to consult pain management or a neurosurgeon.  As the ALJ correctly observed, there are no records from these providers, leading the ALJ to state that there was no evidence that plaintiff followed up on his doctor's recommendation.  Id.  In February 2018, however, Dr. Grewal prescribed oxycodone for plaintiff, noting that neurosurgeon Dr. Youkilis wanted plaintiff to remain on pain medication while he was waiting to see plaintiff.  (Tr. 783).  Because this matter is being remanded for further development of the record with respect to plaintiff's repeated episodes of pneumonia, the Commissioner should consider whether to obtain additional records and/or a consultative examination regarding plaintiff's back pain.

\* \* \* \* \*

For the foregoing reasons, the Court finds that the ALJ's decision is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

/s/ **John M. Bodenhausen**
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of January, 2021.

23